[No. C037254. Third Dist. May 26, 2005.]

BRONCO WINE COMPANY et al., Petitioners, v.
JERRY R. JOLLY, as Director, etc., et al., Respondents;
NAPA VALLEY VINTNERS ASSOCIATION, Intervener.

## COUNSEL

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer; Ropes & Gray and Peter M. Brody for Petitioners.

Bill Lockyer, Attorney General, Miguel A. Neri, Fiel Tigno and Terry Senne, Deputy Attorneys General, for Respondents.

Dickenson, Peatman & Fogarty, Richard P. Mendelson, Deborah E. Quick; Horvitz & Levy, Ellis J. Horvitz; and Kathleen M. Sullivan for Intervener.

## OPINION

**BLEASE, Acting P. J.**—Bronco Wine Company and Barrel Ten Quarter Circle, Inc. (collectively Bronco) filed a petition for writ of mandate, invoking our original jurisdiction. It seeks declaratory and injunctive relief barring application of the labeling requirements of Business and Professions Code section 25241 to wines produced by Bronco that are destined for interstate commerce because the section is in conflict with Bronco's federally approved certificates of label approval (COLA).[1]

Bronco possesses COLA's for the brand names "Napa Ridge," "Rutherford Vintners," and "Napa Creek Winery," which authorize the distribution in interstate commerce of wine bearing these brand names if the true appellation of origin of the grapes used in making the wine appears on the label.[2]

Section 25241 prohibits the use of a brand name with the word "Napa," or any federally recognized viticultural region within Napa County, on the label, packaging material, or advertising of wine produced, bottled, labeled, offered for sale or sold in California, unless at least 75 percent of the grapes used to make the wine are from Napa County, or 85 percent of the grapes used to make the wine are from a viticultural region within Napa County. The statute applies to wine destined for both intrastate and interstate commerce.

We issued a judgment invalidating section 25241 as preempted by federal law because it was in conflict with Bronco's federally approved COLA's. The Supreme Court reversed the judgment and remanded the case for consideration of Bronco's remaining claims that section 25241 violates the free speech provisions of the state and federal Constitutions and the commerce and

---

[1] All further section references are to the Business and Professions Code unless otherwise specified.

[2] An appellation of origin specifies the geographic area where the grapes used to produce the wine are grown. (*Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 951.)

takings clauses of the federal Constitution. (*Bronco Wine Company v. Jolly, supra,* 33 Cal.4th 943 (hereafter *Bronco Wine*).)

We shall deny Bronco's free speech claims on the ground section 25241 is a valid regulation of inherently misleading commercial speech.

We shall deny Bronco's claim the commerce clause invalidates section 25241 on two allied grounds. First, as construed by *Bronco Wine, supra,* 33 Cal.4th 943, the federal law authorizes or contemplates that California may establish stricter wine labeling requirements for wine destined for interstate distribution. Second, the state's interests in protecting California wine consumers from misleading brand names of viticultural significance and in preserving and maintaining the reputation and integrity of its wine industry in out-of-state and foreign markets outweigh the indirect effect of section 25241 on interstate commerce.

Failing its commerce clause and free speech claims, Bronco claims section 25241 effects a total taking of its federal COLA's, in violation of the takings clause of the federal Constitution, because it effectively nullifies the total value of the COLA's issued for any brand name that contains a true appellation of origin outside Napa County. We shall deny the challenge because section 25241 does not bar Bronco from using its brand names under all circumstances and because Bronco has failed to establish the statute has destroyed the substantial economic value of the brand names.

## FACTUAL AND PROCEDURAL BACKGROUND

According to Bronco, it specializes in "premium wines at affordable prices." Some of Bronco's wine is bottled at its wineries in Ceres and Sonoma County; other Bronco wines are bottled under contract by Barrel Ten Quarter Circle, Inc., at a recently completed winery in Napa, California. Bronco sells its wine to wholesalers, and much of it is destined for interstate commerce.

Bronco's wines are bottled and distributed under some 30 labels or brand names. All of the labels have been reviewed and approved by federal regulators from the Bureau of Alcohol, Tobacco, and Firearms (BATF) and COLA's were issued authorizing the use of the labels. (27 C.F.R. §§ 13.1–13.92 (2002).[3]) We discuss the nature of a COLA in greater detail in part III of the discussion.

---

[3] All further citations to the Code of Federal Regulations are to the 2003 edition unless otherwise noted.

Among Bronco's brands that fall within the class of "brand names of viticultural significance" are "Napa Ridge," "Napa Creek Winery," and "Rutherford Vintners" (hereafter Brands). The Brands collectively appear on hundreds of federally approved labels. Examples of current labels used by petitioners bearing these brand names can be seen in the appendix to *Bronco Wine, supra*, 33 Cal.4th at page 998. The brand name appears prominently at the top of each label. Below the brand name appears the designation of the wine, i.e. the grape varietal (White Merlot, Chardonnay, and Merlot respectively), and below that appears the appellation of origin of the grapes used in the wine (Lodi, Lodi, and Stanislaus County respectively).

Bronco acquired the brand names and the labels on which they appear from predecessor owners.[4] The Napa Creek Winery brand name was introduced in 1981 and was acquired by Bronco in 1993. Rutherford Vintners originated in the early 1970's and was acquired by Bronco in 1994. The Napa Ridge brand name has been in trade since the early 1980's. Bronco purchased that name from Beringer Wine Estates in January 2000 for over $40 million.

Beringer was granted COLA's for Napa Ridge and used that name with wines made from grapes grown in the Central Coast, North Coast, and Lodi appellation areas, as well as the Napa Valley appellation area.[5] The labels on the Beringer wines displayed a true and correct appellation of origin disclosing the place where the grapes used to produce the wine were grown. The wine sold by the prior owner of the Napa Creek Winery brand name and most of the wines previously sold by the prior owner of the Rutherford Vintners brand name had been made from Napa County grapes. (See *Bronco Wine, supra*, 33 Cal.4th at p. 951.)

By contrast, Bronco has marketed its wine under all three Brands with wine made from grapes grown entirely outside Napa County. (*Bronco Wine, supra*, 33 Cal.4th at pp. 951–952.) Bronco's annual sales of wines under these Brands amount to 300,000 cases with annual gross revenues of $17 million. Of this amount, approximately 28 percent is attributable to sales within California and the remaining 72 percent is attributable to sales outside California.

More recently, the Bronco bottling facility in Napa County was completed and will have an annual production capacity of 44.8 million gallons of wine

---

[4] Bronco owns federal trademark registrations for "Napa Ridge" and "Napa Creek Winery."

[5] At oral argument counsel for Bronco asserted that Beringer marketed a high volume of wine made from non-Napa-County grapes under the Napa Ridge label. However, counsel failed to provide a citation to the record to confirm this claim. We decline to consider it.

or 18 million cases when the facility is at full capacity. Although that level has not yet been reached, the potential output is double the nine million cases of wine produced annually by Napa Valley wineries. (See *Bronco Wine, supra,* 33 Cal.4th at p. 950.)

Prior to 2000 California generally incorporated the federal standards for wine labels for all purposes. (Cal. Code Regs., tit. 17, § 17075.) In 2000, the Legislature enacted section 25241 after receiving substantial public comment and conducting public hearings. (Stats. 2000, ch. 831, § 1.) The operative provision states in pertinent part: "No wine produced, bottled, labeled, offered for sale or sold in California shall use, in a brand name or otherwise, on any label, packaging material, or advertising, any of the names of viticultural significance listed in subdivision (c), unless that wine qualifies under Section 4.25a [now section 4.25[6]] of Title 27 of the Code of Federal Regulations for the appellation of origin Napa County and includes on the label, packaging material, and advertising that appellation or a viticultural area appellation of origin that is located entirely within Napa County, subject to compliance with Section 25240." (§ 25241, subd. (b).)

In support of this enactment, the Legislature made the following findings: "(a)(1) . . . for more than a century, Napa Valley and Napa County have been widely recognized for producing grapes and wine of the highest quality. Both consumers and the wine industry understand the name Napa County and the viticultural area appellations of origin contained within Napa County (collectively 'Napa appellations') as denoting that the wine was created with the distinctive grapes grown in Napa County. [¶] (2) The Legislature finds, however, that certain producers are using Napa appellations on labels, on packaging materials, and in advertising for wines that are not made from grapes grown in Napa County, and that consumers are confused and deceived by these practices. [¶] (3) The Legislature further finds that legislation is necessary to eliminate these misleading practices. It is the intent of the Legislature to assure consumers that the wines produced or sold in the state with brand names, packaging materials, or advertising referring to Napa appellations in fact qualify for the Napa County appellation of origin." (§ 25241, subd. (a).)

The Legislative history discloses that section 25241 was designed to halt the sale and advertisement of wine bearing the prohibited Brands by closing a so-called loophole created by an exception in the federal wine labeling regulatory scheme, referred to as the "grandfather clause." (*Bronco Wine,*

---

[6] Under the federal regulations, an American Viticultural Area (AVA) is defined as "[a] delimited grape growing region distinguishable by geographical features, the boundaries of which have been recognized and defined . . . ." (27 C.F.R. § 4.25(e)(1)(i).) To qualify to use an AVA on a wine label, no less than *85 percent* of the wine must be made with grapes grown within that viticultural area. (27 C.F.R. § 4.25(e)(3)(ii).)

*supra,* 33 Cal.4th at p. 953.)[7] While the federal regulations governing brand names are generally coextensive with the prohibition expressed in section 25241 (see 27 C.F.R. § 4.39(i)(1) [". . . a brand name of viticultural significance may not be used unless the wine meets the appellation of origin requirements for the geographic area named"]), the federal regulations except from this rule "brand names used in existing certificates of label approval issued prior to July 7, 1986." (27 C.F.R. § 4.39(i)(2).) These excepted brand names may be used as long as the label states the correct appellation of origin or some other statement that is "sufficient to dispel the impression that the geographic area suggested by the brand name is indicative of the origin of the wine." (27 C.F.R. § 4.39(i)(2)(B)(iii).) Petitioners' labels comply with this exception by specifying the correct appellation of origin, i.e., Lodi or Stanislaus County.

Pursuant to an inquiry by Bronco made after passage of section 25241, the Department of Alcoholic Beverage Control (the Department) advised Bronco that it intended "to enforce Section 25241 pursuant to its terms" and that if Bronco continues to use its labels in violation of section 25241, "the Department may take disciplinary action against the license of Bronco Wine Company, up to and including revocation of [Bronco's] license."

On December 22, 2000, Bronco filed an original petition for writ of mandate in this court seeking to enjoin respondents (the Department and its then Interim Director, Manuel R. Espinoza, currently Jerry R. Jolly, Director) from enforcing section 25241. Bronco asserted that section 25241 was preempted by the grandfather clause of 27 Code of Federal Regulations section 4.39(i)(2), and that it violated its rights of free speech under the California and United States Constitutions, the commerce clause, and the takings clause of the Fifth Amendment to the United States Constitution. Without addressing the last three claims, we issued a peremptory writ of mandate after finding that section 25241 is preempted by federal law.

On respondent's petition for review, the California Supreme Court reversed the judgment, finding that section 25241 prohibits what federal law does not prohibit and concluding the section does not stand as an obstacle to the accomplishment and execution of the purpose and objectives of federal law because there is a long history of concurrent state and federal regulation of wine labels, including the regulation of brand names that suggest the place of origin of the grapes used in making the wine. (*Bronco Wine, supra,* 33 Cal.4th at pp. 992, 995–997.) The court reversed the judgment and remanded

---

[7] The legislative history is replete with statements regarding the worldwide reputation of Napa Valley wines and the necessity of closing the federal loophole to protect that reputation.

the case to this court to address Bronco's remaining constitutional claims. (*Bronco Wine, supra,* 33 Cal.4th at p. 997.)

We do so.

## DISCUSSION

### I

### Free Speech

We begin with the free speech claims because the analysis of the interests served by the California legislation are a predicate to the analysis of the commerce clause and takings claims.

Bronco contends section 25241 violates its free speech rights under the United States and California Constitutions.[8] It argues the Legislature had insufficient evidence before it to reasonably conclude that its brand names of viticultural significance are misleading or that Bronco's labels are inherently misleading. It further argues that section 25241 is a content-based regulation subject to strict scrutiny, but also fails the less rigorous test applied to commercial speech under *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*).

Respondents contend section 25241 is a regulation of deceptive and misleading commercial speech that is not entitled to First Amendment protection. We agree with respondent.

▆ Under the First Amendment to the United States Constitution,[9] commercial speech is entitled to protection from governmental regulation

---

[8] Citing few California cases and without engaging in any meaningful analysis under California law, Bronco claims section 25241 violates its free speech rights under the California Constitution. While the California provision protecting free speech rights (Cal. Const., art. I, § 2, subd. (a)), has been construed as " 'more definitive and inclusive than the First Amendment' " (*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341], quoting *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]), Bronco cites no California cases holding the California provision broader with respect to false, deceptive, or misleading commercial speech. Because this case involves inherently misleading commercial speech, we will confine our analysis to petitioners' First Amendment claims.

[9] The First Amendment provides in pertinent part: "Congress shall make no law . . . abridging the freedom of speech . . . . (U.S. Const., 1st Amend.)

(*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council* (1976) 425 U.S. 748, 762 [48 L.Ed.2d 346, 358–359, 96 S.Ct. 1817]), although it is entitled to less protection than other constitutionally guaranteed speech. (*Central Hudson, supra,* 447 U.S. at pp. 563, 566 [65 L.Ed.2d 349, 351]; *Lorillard Tobacco Company v. Reilly et al.* (2001) 533 U.S. 525, 555 [150 L.Ed.2d 532, 559, 121 S.Ct. 2404] (*Lorillard Tobacco Company*).)

■ Commercial speech is "expression related solely to the economic interests of the speaker and its audience" (*Central Hudson, supra,* 447 U.S. at p. 561 [65 L.Ed.2d at p. 348]) and "does no more than propose a commercial transaction . . . ." (*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, supra,* 425 U.S. at p. 776 [48 L.Ed.2d at p. 367].) To that end, it serves the economic interests of the speaker, while assisting consumers and furthering the societal interest in the free flow of commercial information. (*Id.* at pp. 765 [48 L.Ed.2d at p. 360].)

■ The court in *Central Hudson* set forth a four-part analysis for evaluating the constitutionality of restrictions on commercial speech. The first inquiry is "whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (*Central Hudson, supra,* 447 U.S. at p. 566 [65 L.Ed.2d at p. 351].)

■ As the Supreme Court has recently made clear, commercial speech is not subject to the test of strict scrutiny. (*Lorillard Tobacco Company, supra,* 533 U.S. at pp. 554–555 [150 L.Ed.2d at p. 559].) "[T]he leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena." (*Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 383 [53 L.Ed.2d 810, 835, 97 S.Ct. 2691].) "The First Amendment's concern for commercial speech is based on the informational function of advertising. [Citations omitted.] Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication *more likely to deceive* the public than to inform it . . . ." (*Central Hudson, supra,* 447 U.S. at p. 563 [65 L.Ed.2d at p. 349], italics added.)

■ Thus, our inquiry is whether the speech regulated by section 25241 is unlawful or misleading. Where it is claimed the speech is misleading, the Supreme Court has distinguished between "inherently misleading" speech and

"potentially misleading" speech. (*In re R.M.J.* (1982) 455 U.S. 191, 203 [71 L.Ed.2d 64, 74, 102 S.Ct. 929]; see *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio* (1985) 471 U.S. 626, 638 [85 L.Ed.2d 652, 664, 105 S.Ct. 2265] (*Zauderer*).) If "advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive," the speech is unprotected. (*In re R.M.J., supra,* at p. 202 [71 L.Ed.2d at p. 73].) If the speech is only "potentially misleading," because "the information also may be presented in a way that is not deceptive," the regulation must satisfy the remaining three factors specified in *Central Hudson.* (*Id.* at p. 203 [71 L.Ed.2d at p. 74].)

Once it is determined that commercial speech is inherently misleading, our inquiry ends. (*Central Hudson, supra,* 447 U.S. at p. 566 [65 L.Ed.2d at p. 351]; *In re R.M.J., supra,* 455 U.S. at p. 203 [71 L.Ed.2d at p. 74]; *Zauderer, supra,* 471 U.S. at p. 638 [85 L.Ed.2d at p. 664]; *Friedman v. Rogers* (1979) 440 U.S. 1, 9 [59 L.Ed.2d 100, 110, 99 S.Ct. 887] (*Friedman*).) In such a case there is no First Amendment interest at stake, and the tests which measure the validity of the state's interest in regulating free speech do not apply.

*Friedman, supra,* 440 U.S. 1 [59 L.Ed.2d 100], is instructive. The court held that Texas could prohibit the deceptive use of trade names by optometrists. It said the use of a trade name in connection with an optometrical practice is a form of commercial speech that has no intrinsic meaning. This is so because a trade name conveys no information about the price or nature of the services offered until it acquires meaning over time when the public forms associations between the name and some standard of price or quality. (*Id.* at pp. 11–12 [59 L.Ed.2d at pp. 111–112].) For that reason "the restriction on the use of trade names has only the most incidental effect on the content of the commercial speech . . . ." (*Id.* at pp. 15–16 [59 L.Ed.2d at pp. 113–114].)

The court in *Friedman* found the possibilities for deception numerous, citing as an example the fact that a trade name of an optometrical practice may remain unchanged despite changes in staff whose degree of skill and care patients have come to rely upon. "[T]he public may be attracted by a trade name that reflects the reputation of an optometrist no longer associated with the practice." (*Friedman, supra,* 440 U.S. at p. 13 [59 L.Ed.2d at p. 112].) The court found the concerns of the Texas Legislature about the deceptive and misleading use of trade names were not speculative or hypothetical but were based upon specific practices that the legislature was familiar with. (*Ibid.*)

Bronco does not dispute that brand names are commercial speech. Indeed, brand names, like the trade names at issue in *Friedman* have no intrinsic

meaning. Since they are transferable they do not necessarily reflect the continued quality of the product offered and need not convey information about the nature, quality, or origin of the product unless associations have been made by the public over time. (*Friedman, supra,* 440 U.S. at p. 12 [59 L.Ed.2d at p. 111].)

■ While a brand name generally does not have intrinsic meaning, a brand name of geographic or viticultural significance conveys information about the geographic source of the grapes used to make the wine. For that reason a brand name of geographic significance is entitled to First Amendment protection as commercial speech only if the information about the source of the wine is accurate. To the extent a brand name of geographic significance is more likely to deceive the public than to inform it because it is suggestive of a false or misleading source of the grapes used in making the wine, it is inherently misleading and its use may be prohibited. (*Central Hudson, supra,* 447 U.S. at p. 563 [65 L.Ed.2d at p. 349]; *Lorillard Tobacco Company, supra,* 533 U.S. at pp. 554–555 [150 L.Ed.2d at p. 559].)

■ Section 25241 imposes restrictions on brand names by prohibiting the use of the word "Napa," or the name of any federally recognized viticultural area within Napa County in a brand name unless the wine is sourced with grapes from Napa County. (§ 25241, subd. (b).) In enacting the section, the Legislature found that "Napa Valley and Napa County have been widely recognized for producing grapes of the highest quality" and that "consumers and the wine industry understand the name Napa County and the viticultural area appellations of origin contained within Napa County . . . as denoting that the wine was created with the distinctive grapes grown in Napa County." (§ 25241, subd. (a)(1).) The Legislature further found that consumers are confused and deceived by wine labels, packaging, or advertisements that bear Napa appellation brand names on wines not made from grapes grown in Napa County. (§ 25241, subd. (a)(2).) Thus, the purpose of section 25241 is to eliminate the use of inherently misleading geographic brand names.

Bronco contends the Legislature had no evidence of consumer confusion when it enacted section 25241. It would require trial-type evidence as the measure whether Bronco's labels are misleading. Bronco has misunderstood the posture of the case. This is a facial attack on a statute. The test is whether the Legislature could reasonably conclude, on the basis of the record before it, that the particular brand names of geographic or viticultural significance concerning Napa County "are more likely to deceive the public than inform it" about the origin of the grapes used to produce the wine when the grapes are not grown in the area signified.

■ It is true that facts about Bronco's purchase and use of brand names and COLA's were at the center of the Legislature'sconcerns when it enacted

section 25241. However, that does not change the question before us, whether the Legislature had a sufficient factual basis for making its findings. Because the Legislature may consider specific practices that come to its attention when legislating to remedy a problem (*Friedman, supra,* 440 U.S. at p. 13 [59 L.Ed.2d at p. 112]), the standard of review remains the same and we may consider those practices as part of the record considered by the Legislature.

■ When reviewing an enactment to determine whether it is supported by an adequate factual basis, the courts look to the legislative record relevant to the provision. (*United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803, 820–822 [146 L.Ed.2d 865, 883–885, 120 S.Ct. 1878] [record inadequate where no legislative record to support a floor amendment].) The record may include consumer surveys, studies, and anecdotal evidence (*FTC v. Brown & Williamson Tobacco Corp.* (D.C. Cir. 1985) 250 U.S. App. D.C. 162 [778 F.2d 35, 40–41]; *Florida Bar v. Went for It, Inc.* (1995) 515 U.S. 618, 628 [132 L.Ed.2d 541, 552, 115 S.Ct. 2371]; *Edenfield v. Fane* (1993) 507 U.S. 761, 771 [123 L.Ed.2d 543, 556, 113 S.Ct. 1792]), and specific practices of which the legislature was aware. (*Friedman, supra,* 440 U.S. at p. 13 [59 L.Ed.2d at p. 112].) Where the possibility of deception is self-evident, the state need not conduct a survey of the public before the court may determine that the prohibited speech is misleading. (*Zauderer, supra,* 471 U.S. at p. 653 [85 L.Ed.2d at p. 673]; see also *FTC v. Brown & Williamson Tobacco Corp., supra,* 778 F.2d at p. 40.) "[E]ven . . . a case applying [a] strict scrutiny" test of the validity of restrictions on speech may be "based solely on history, consensus, and 'simple common sense.' " (*Florida Bar v. Went for It, Inc., supra,* 515 U.S. at p. 628 [at p. 552], quoting *Burson v. Freeman* (1992) 504 U.S. 191, 211 [119 L.Ed.2d 5, 22, 112 S.Ct. 1846]; *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 50–51 [89 L.Ed.2d 29, 40, 106 S.Ct. 925].)

Prior to enactment of section 25241, the Legislature held hearings, took testimony, and made findings of fact, concluding that the names Napa or any appellation suggesting a viticultural region within Napa County on labels of wine made from non-Napa-grown grapes are likely to mislead consumers. (§ 25241, subd. (a)(2).) This finding is supported by the regulatory history of brand names of geographic significance, as well as the testimony[10] and survey considered by the Legislature.

---

[10] The Legislature heard testimony given by representatives of the Napa Valley Vintners Association, the California Retailers Association, the Family Wine Makers of California, wine retailers, winery owners, and representatives of Bronco and its attorneys. Communications from constituents were received on behalf of wine producers, retailers, the Napa County Board of Supervisors, and restaurants, all expressing concern about the misuse of geographic brand names that imply the wine is sourced with grapes grown in the Napa Valley when in fact it is not.

Indeed, Bronco's claim the Legislature's finding of fact is unsupported by the evidence ignores the significance of appellations of origin. It is beyond dispute the place where the grapes are grown is a significant factor contributing to the quality of wine made from the grapes and is one of two factors considered by consumers when purchasing wine.[11] It is also beyond dispute that Napa grapes are known for their premium quality.[12] As a result, wines made from Napa Valley grapes command a premium price.[13]

Because there is a causal link between the quality of the wine and the grape's origin and a semantic link between Napa County and quality wine, a brand name such as Napa Ridge or Napa Creek Winery is naturally associated with grapes from the Napa Valley. The clear implication from such brand names is that the wine is made from Napa Valley grapes and is of premium quality. If it were otherwise, Bronco would not have spent $40 million dollars for the brand name Napa Ridge and built a bottling facility in Sonoma with the capacity to bottle 18 million cases of wine annually.[14] Indeed, Bronco did not purchase the vineyards or winery that produced Napa Ridge wine. It only purchased the brand name. It is reasonable to assume Bronco concluded the

---

[11] The evidence established that the location where the grapes are grown is very significant to the quality of the wine produced and is of great concern to wine consumers who have developed an expectation as to the qualities and characteristics of the grapes from a particular appellation. One wine retailer testified that the consumer asks two questions when selecting wine; one relating to the type of wine, the other relating to the location or source of the wine.

[12] Volker Eisele, president of the Napa Valley Grape Growers Association, testified that the unique conditions present in the Napa Valley produce grapes of exceptional quality. The ice-cold Japan airstream in the Pacific provides the necessary cooling, without which the grapes would not have their character, color, and intensity. The enormous diversity of microclimates and soils allows grape growers to plant many different varieties of grapes with outstanding results, from cooler areas where Pinot Noir and Chardonnay thrive to the warmer locations where Cabernet Sauvignon and its relatives have achieved worldwide recognition. Globally, few regions have comparable growing conditions. Napa Valley's unique conditions have turned its wine industry into "the locomotive" that pulls the rest of the state's wine industry. As a result of Napa Valley's worldwide reputation as a preeminent wine-producing region, Napa Valley wines command premium prices.

[13] Testimony at one of the legislative committee hearings established that in 1999, the average price for Napa Valley Cabernet Sauvignon grapes was $2,600 a ton compared to Lodi Cabernet Sauvignon grapes, which sold for $600 a ton. The largest harvest of Cabernet Sauvignon grapes in the state is grown in Lodi, an amount substantially larger than that grown in Napa Valley.

[14] When testifying before the Senate, Fred Franzia, Chief Financial Officer of Bronco Wine Company, was asked whether the increased production capacity was going to be used to mislead consumers into buying wine with a Napa name but made from grapes grown elsewhere. He replied: "Let me tell you what. If I could sell 18 million cases of Napa Ridge, I'd be one happy guy." Franzia advised the committee that his "basic premise in doing things is to make money and I'm putting that operation up there at the request of customers to bottle wines there in addition to our other ones and we'll be in the money-making business."

name Napa Ridge, by itself, is valuable because it has name recognition that signifies quality.[15]

However, if the wine produced under such a name is not made with Napa Valley grapes, it is marketed as something it is not while benefiting from the reputation of Napa Valley wine. Bronco's actions belie its claim that using its Brands on wine produced with non-Napa-Valley wine is not misleading. This conclusion is confirmed by survey evidence commissioned by intervener that was before the Legislature.[16] The survey concluded that the use of the name "Napa Valley" in a brand name led the survey respondent to believe the wine was sourced from grapes grown in Napa Valley.[17] Thus, it is clear from the record before the Legislature that the use of the word Napa in a brand name causes the consumer to believe the wine is made from grapes grown in the Napa area.

Looking to other jurisdictions, we find that in 1977, Oregon adopted an administrative regulation similar to section 25241. (Former Or. Admin. R. 845-010-0292(6)(e) (1977); see *Bronco Wine, supra,* 33 Cal.4th at p. 984.) As currently formulated and renumbered, it prohibits the use of an appellation of origin, including names of Oregon counties and viticultural areas located wholly or partially in Oregon (such as Willamette Valley, Umpqua Valley and Rogue Valley) "that may be mistaken for an approved appellation of origin in a brand name, in a winery name, or in any other manner on a wine label unless the wine meets the requirements for use of that appellation of origin." (Or. Admin. R. 845-010-0920(3) and (4)(f) (2005).)

Federal regulators have also found that brand names of viticultural significance are misleading when the brand name does not accurately reflect the wine's true origin. In 1986, the BATF promulgated new regulations relating to brand names of geographic significance. For new brand names, the regulations prohibit the use of a brand name of geographic significance "unless the wine meets the appellation of origin requirements for the geographic area named." (27 C.F.R. § 4.39(i)(1).) The BATF found "[t]he brand name, usually the most prominent item on a wine label, in certain instances

---

[15] This is the implied ground upon which Bronco makes a brand equity argument supporting its takings claim.

[16] Although Bronco complains that respondents have failed to submit copies of this survey, the United States Supreme Court has stated that copies of the actual survey need not be provided to the court when justifying restrictions on speech. (*Florida Bar v. Went for It, Inc., supra,* 515 U.S. at p. 628 [132 L.Ed.2d at p. 552].)

[17] The results of that poll show that 99 percent of those polled thought a wine with the brand name "Napa Valley Caves" was from Napa Valley; 81 percent believed it was confusing if the brand name included the word "Napa" but the grapes did not come from Napa Valley; 91 percent felt it was deceptive to use a geographic region known for wine in a brand name even if the grapes came from another region; 82 percent indicated the brand name is important when purchasing wine.

conveys information to the consumer. In the case of a geographic brand name of viticultural significance, [B]ATF believes that such a name on a label indicates the origin of the wine, that is, the place where the grapes were grown." (51 Fed. Reg. 20480, 20481 (June 5, 1986).) The BATF concluded the use of the word "brand" or the specification of the appellation of origin on the label was insufficient to dispel a misleading impression. (51 Fed. Reg., *supra*, p. 20481.)

The BATF did adopt, as to brand names of geographic significance used in COLA's issued prior to July 7, 1986, a grandfather clause that allows the holder of the COLA to use a geographic brand name for wine that is not made with grapes from the named geographic area if the wine is labeled with a *true appellation* of origin. (27 C.F.R. § 4.39(i)(2)(ii).)[18] However, this exception to the general rule was the result of a compromise between the economic interests of wineries which owned existing brand names and the interests of prospective consumers likely to be misled by them. (See 51 Fed. Reg., *supra*, p. 20482.) The regulatory history indicates that prior to enactment of the grandfather clause, the BATF stated, in reference to a proposed rule strictly regulating the use of terms of viticultural significance in brand names, its belief "the wine industry should be allowed flexibility in selecting brand names under which to market their products without having a whole class of brand names become totally unusable." (49 Fed. Reg. 19330, 19331–19332 (May 7, 1984); see *Bronco Wine, supra*, 33 Cal.4th at p. 987, fn. 70.) Because the compromise is based upon policy considerations rather than findings of fact, the grandfather clause does not undermine the findings made by either the BATF or the California Legislature that the use of geographic brand names is misleading when used for wine made from grapes grown outside the named geographic area.

---

[18] Section 4.39(i)(2) of the 27 Code of Federal Regulations provides: "For brand names used in existing certificates of label approval issued prior to July 7, 1986:

"(i) The wine shall meet the appellation of origin requirements for the geographic area named; or

"(ii) The wine shall be labeled with an appellation of origin in accordance with § 4.34(b) as to location and size of type of either:

"(A) A county or a viticultural area, if the brand name bears the name of a geographic area smaller than a state, or;

"(B) A state, county or a viticultural area, if the brand name bears a state name; or

"(iii) The wine shall be labeled with some other statement which the appropriate ATF officer finds to be sufficient to dispel the impression that the geographic area suggested by the brand name is indicative of the origin of the wine.

"(3) A name has viticultural significance when it is the name of a state or county (or the foreign equivalents), when approved as a viticultural area in Part 9 of this chapter, or by a foreign government, or when found to have viticultural significance by the appropriate ATF officer."

Moreover, contrary to Bronco's assertion, there is nothing in the federal rulemaking history to suggest the Brands at issue acquired a "secondary meaning" sufficient to dispel a misleading impression regarding the origin of the grapes used to produce the wine. To the contrary, because brand names are transferable and Bronco acquired these Brands during the 1990's, any "secondary meaning" acquired prior to Bronco's purchase would not necessarily reflect on the quality of Bronco's wine. (*Friedman, supra*, 440 U.S. at pp. 15–16 [59 L.Ed.2d at pp. 113–114].)

Nevertheless, Bronco argues, with supporting declarations by wine experts, that wine consumers who are sophisticated enough to consider the origin of a wine when selecting it will not be misled by the brand names because they understand that the appellation of origin specified on the label indicates the true location of the grape source. We disagree.

Even if we assume some consumers are not misled, the Legislature could reasonably conclude that not all wine consumers are equally knowledgeable. Although more sophisticated wine consumers may not be misled by a brand name of viticultural significance that does not meet the appellation of origin requirements, other wine consumers are unaware of the technical meaning of the term "appellation of origin," and do not understand the significance of the specification of origin on the label. At the same time, these less sophisticated wine consumers are sufficiently aware of Napa Valley and its reputation as a premium wine growing region and consider that factor when purchasing wine. Moreover, consumers in other states or foreign countries who are knowledgeable about appellations of origin may not be sufficiently knowledgeable about Northern California and Napa County geography to know that Lodi or the North Coast are not within Napa County or that Napa Valley is not a coastal region. In addition, a consumer who purchases wine from a menu in a restaurant may not see the bottle before ordering and therefore may not be informed of the correct appellation of origin at the time the wine is ordered. (*Bronco Wine, supra*, 33 Cal.4th at p. 952, fn. 5.) As a result, the specification of a true appellation of origin may not be sufficient to dispel the misleading impression given by the geographic brand name.

Likewise, the Legislature could make a similar finding with respect to brand names using subappellations of Napa County. Unsophisticated wine consumers who are not conversant with the term "appellation of origin" and are unaware of the significance of its designation on a wine label may nevertheless be sufficiently knowledgeable about Northern California and Napa County geography to know that areas such as Rutherford, St. Helena, Stags Leap District, and Oakville are areas within Napa County. These consumers may assume that a wine sold under a brand name that includes one of these areas is a wine that is produced from Napa County grapes.

Bronco also attempts to raise an as-applied challenge on the theory its labels are only potentially misleading. It argues that there was no evidence consumers were misled by its labels, its labels are not inherently misleading or deceptive, and such a conclusion is inconsistent with the considered judgment of the BATF, which has determined that as a matter of fact, Bronco's brand names are not misleading.[19]

Bronco fares no better with its as-applied challenge because it has failed to establish that its labels are not inherently misleading. Although Bronco's expert testimony suggests that sophisticated consumers would not be misled by its labels, as we have noted not all consumers are equally knowledgeable, and as the Legislature found, many consumers are in fact confused and deceived by labels with geographic brand names. Because the federal regulations do not preempt section 25241 (*Bronco Wine, supra,* 33 Cal.4th at pp. 995–997) and the grandfather clause is based on a policy decision rather than a factual finding, issuance of a COLA does not constitute a finding of fact that overrides a contrary finding by the California Legislature].)[20]

Thus, Bronco's reliance on *Peel v. Attorney Registration & Disciplinary Comm'n* (1990) 496 U.S. 91 [110 L.Ed.2d 83, 110 S.Ct. 2281] (designation on letterhead of certification as civil trial specialist facially true); *Zauderer, supra,* 471 U.S. 626 [85 L.Ed.2d 652] (advertising by attorney contained illustration and legal advice that were nondeceptive); and *In re R.M.J., supra,* 455 U.S. at p. 203 [71 L.Ed.2d at p. 74] (advertising by attorney contained

---

[19] Bronco also argues that it uses its Brands as "trademarks," not statements of geographic origin, and that a trademark that is "primarily geographically deceptively misdescriptive" of the goods nevertheless can be registered as a federal trademark if the mark "has become distinctive of the applicant's goods in commerce." (See 15 U.S.C. § 1052(e)(3) & (f).) We fail to see the relevance of this assertion in the context of a First Amendment claim, which provides no protection to a trademark that is "deceptively misdescriptive." (See *Friedman, supra,* 440 U.S. at pp. 15–16 [59 L.Ed.2d at pp. 113–114].)

[20] At oral argument Bronco's attorney cited *Piazza's Seafood World, LLC v. Bob Odom, Commissioner, Louisiana Dep't of Agriculture & Forestry* (E.D.La., Dec. 23, 2004) 2004 U.S. Dist. Lexis 25991, as support for the proposition we may go behind the Legislature's findings and apply the standard for potentially misleading speech. *Piazza's Seafood World* does not advance Bronco's claim.

In *Piazza's Seafood World,* an importer of seafood raised a First Amendment challenge to Louisiana's catfish labeling law. The law banned the sale of food products under the name "Cajun" unless the food was grown, raised, produced, or substantially transformed in Louisiana. The plaintiff marketed catfish grown in China under the trade name "Cajun Boy" with labels that clearly disclosed the fish came from China. The court found the use of the trade name was only potentially misleading because the catfish was marketed to a sophisticated group of wholesalers who would discern from the label that the fish came from China.

By contrast, section 25241 seeks to protect the ultimate consumer, who may be less sophisticated than a wine wholesaler; and the consumer's familiarity with an appellation of origin such as Lodi or Stanislaus County cannot be compared with a consumer's familiarity with a country such as China.

truthful list of areas of practice) is misplaced. Bronco claims its Brands fall into the category of potentially misleading commercial speech and the remedy is additional disclosure rather than a ban on speech. We have already found that Bronco's labels involve inherently misleading speech. Accordingly, use of them may be banned. (*Central Hudson, supra*, 447 U.S. at p. 566 [65 L.Ed.2d at p. 351].)

Bronco also raises two related equal protection claims, contending that section 25241 targets the speech of a particular speaker. First it argues that section 25241 is subject to strict scrutiny because it discriminates among speakers with respect to fundamental rights. We disagree.

We have already noted that strict scrutiny does not apply to commercial speech. (See *Lorillard Tobacco Company, supra*, 533 U.S. at pp. 554–555 [150 L.Ed.2d at p. 559].) Since section 25241 bars only misleading commercial speech, which is wholly unprotected, Bronco fares no better under the equal protection clause than under the First Amendment. (*City of Renton v. Playtime Theatres, supra*, 475 U.S. at p. 55, fn. 4 [89 L.Ed.2d at p. 42].)

Second, Bronco argues that section 25241 is underinclusive because it fails to regulate non-Napa brand names as well as subappellations within Napa County. With respect to non-Napa brand names, Bronco points out the section does not affect grandfathered brand names that use geographical brand names outside Napa County where the wine does not meet the appellation requirements for that appellation. For example, brand names such as "Monterey Peninsula" and "Sonoma Creek" are not prohibited by the statute despite the fact the wines are not sourced with grapes from the corresponding viticultural area of Monterey (27 C.F.R. § 9.98 (1987) or Sonoma Valley. (27 C.F.R. § 9.29 (1987).)

With respect to the subappellations within Napa County, Bronco complains that the statute allows smaller viticultural appellations within Napa County to use the general Napa County appellation requirement rather than the more limited viticultural appellation within the county despite the fact the wine is not sourced from the named viticultural area. Examples of these brand names are "Guenoc," "Stag's Leap Wine Cellars," "Rutherford Hill" and "Wild Horse," which are permissible under the statute. (27 C.F.R. § 9.26 (1981) (Guenoc); 27 C.F.R. § 9.117 (1989) (Stags Leap District); 27 C.F.R. § 9.133 (1993) (Rutherford); 27 C.F.R. § 9.124 (1988) (Wild Horse Valley).)

█ We find no constitutional impediment to regulation. Because inherently misleading speech is unprotected speech (*Central Hudson, supra*, 447 U.S. at p. 563 [65 L.Ed.2d at p. 349]; *City of Renton v. Playtime Theatres, supra*, 475 U.S. at p. 55, fn. 4 [89 L.Ed.2d at p. 42]), the Legislature may

proceed step by step to limit misleading speech in the same manner as it would to eliminate other perceived evils. The Legislature "need not 'strike at all evils at the same time or in the same way,' . . . [but] 'may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.' " (*Minnesota v. Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 466 [66 L.Ed.2d 659, 670, 101 S.Ct. 715], quoting *New Orleans v. Dukes* (1976) 427 U.S. 297, 303 [49 L.Ed.2d 511, 517, 96 S.Ct. 2513]; see also *United States and Federal Communications Commission v. Edge Broadcasting Co.* (1993) 509 U.S. 418, 434 [125 L.Ed.2d 345, 360, 113 S.Ct. 2696].)

Here, the Legislature could reasonably conclude that while the use of brand names of geographic significance causes consumer confusion, not all such names pose the same threat to the reputation and integrity of the Napa Valley wine growing region. Section 25241 was designed to eliminate a specific threat. Nor does section 25241 target a particular speaker. It bans an entire class of unprotected speech, the use of a Napa area brand name on labels of non-Napa-County wines. There are 35 grandfathered brand names that are prohibited by the statute and Bronco's brand names comprise but three of them. Because Napa County is California's preeminent wine producing region, which also consists of a number of smaller viticultural areas within it, the Legislature has recognized Napa County as a single, cohesive wine growing area. (§ 25240 [requiring the Napa name to appear in direct conjunction with all Napa subappellations].) For this reason, the Stag's Leap Winery may use non-Stags-Leap area grapes, but the Stag's Leap wine label must bear the Napa County appellation and must comply with the requirement that 75 percent of the grapes used to produce its wine originate in Napa County (§§ 25240, 25241; 27 C.F.R. 4.25(a) and (b)), thereby ensuring the integrity and high quality of Napa County wines.

The fact the Legislature took notice of petitioners' trade practices, their recent purchase of three grandfathered Brands, and their new bottling facility in Napa County shows it recognized a growing problem that had reached a critical threshold with respect to California's premier wine growing region and decided to take action to correct it. The Legislature regulated a deception where experience showed it to be most felt.

■ In summary, federal and state regulators, the wine industry, and the general public view the origin of the wine as a significant factor affecting its quality and consider the use of a geographic brand name misleading where the wine is not made with grapes grown in the named geographic area. Accordingly, the Legislature was standing on firm ground when it concluded the name Napa in a brand name is inherently likely to mislead consumers when the grapes used to make the wine are not grown in the Napa Valley.

## II

### Commerce Clause

Bronco contends section 25241 violates the dormant commerce clause because it has an extraterritorial effect and directly regulates and unduly burdens interstate and foreign commerce in wine. The challenge is made to labels on wine destined for sale in interstate commerce.

Respondents and intervener counter that section 25241 does not violate the commerce clause because the provision regulates wholly intrastate activities and the indirect or incidental effect on interstate commerce is outweighed by the state's legitimate interests in protecting California wine consumers from misleading wine labels, as well as the integrity, reputation, and value of its premier Napa Valley wine industry. We agree with respondents.

Bronco assumes its commerce clause claims are unrelated to the determinations made incident to the resolution of its preemption claims by the California Supreme Court. The court concluded that Congress, in its effort to provide minimum standards for wine labels, did not foreclose the adoption of stricter standards by the states. The court said that "Bronco's assertions of implied preemption are contradicted by the long history . . . of concurrent state and federal regulations of wine labels including, historically, the representations appearing on labels suggesting the place of origin of the grapes used to make wine." (*Bronco Wine, supra,* 33 Cal.4th at p. 997.)

The Supreme Court referred inter alia to the position taken by the BATF at the time of adoption of the regulations containing the grandfather clause. "[I]t is evident that the BATF envisions that states will enforce their own labeling laws to the extent they impose more stringent requirements . . . ." (*Bronco Wine, supra,* 33 Cal.4th at p. 996.) The court cited to provisions of the Federal Register, which explained the reasons for enactment of the 1986 regulations. (51 Fed. Reg. 3773, 3774 (Jan. 30, 1986).) The Register remarked regarding the prior regulation that "[o]ne Federal requirement for use of an American viticultural area was conformity with the laws and regulations of the state in which the viticultural area was located [§ 4.25a(e)(3)(v)]. Thus, wine claiming a 'Napa Valley' appellation was required by Federal regulation to conform to California law." (*Ibid.*)

The BATF explained that a "Federal requirement for compliance with State laws and regulations is both unnecessary and difficult for the Federal Government to enforce due to the multitude of state and local laws and regulations." (51 Fed. Reg., *supra,* pp. 3773, 3774.) Having viewed this as a federal enforcement problem, the register says that "[s]tate laws and

regulations of the state in which the wine was fermented or finished will, of course, continue to apply to the producing winery. These state laws and regulations are enforced by the state involved." (*Ibid.*)

In most cases the federal and state regulations are congruent. The federal regulations generally authorize a state to enact label requirements in excess of those required by federal law. Thus, 27 Code of Federal Regulations part 4.25(b)(1)(i) provides that an American wine is entitled to bear a brand name of geographical significance if "at least" 75 percent of the wine is derived from grapes from the area signified. For this reason, a state requirement that 100 percent of the grapes must be derived from the area is in compliance with the federal law since it meets the "at least" requirement.

Of course, Bronco cannot comply with section 25241 and use its existing COLA's pursuant to the grandfather provisions of the federal regulation, though it otherwise can comply with both state law and the federal regulations. Nevertheless, the California Supreme Court has held the state law prevails over the federal regulations, even as to wine destined for interstate commerce, because a long history of concurrent state and federal regulatory schemes has sanctioned state laws that protect consumers of wine from misleading labeling. (*Bronco Wine, supra,* 33 Cal.4th at p. 997.) The policy runs against the claim the commerce clause was violated by the very law that Congress impliedly sanctioned. It is an example of "local regulations whose effect upon the national commerce is such as not to conflict but to coincide with a policy which Congress has established with respect to it." (*Parker v. Brown* (1943) 317 U.S. 341, 363 [87 L.Ed. 315, 333, 63 S.Ct. 307].)

 The commerce clause is an express grant of authority to Congress "[t]o regulate commerce with foreign nations, and among the several states . . . ." (U.S. Const., art. I, § 8, cl. 3.) This grant of authority includes an implied limitation on the states' authority to adopt legislation that affects commerce. It is often referred to as the dormant commerce clause. (*Healy v. Beer Institute* (1989) 491 U.S. 324, 326, fn. 1 [105 L.Ed.2d 275, 281, 109 S.Ct. 2491] (*Healy*); *Hughes v. Oklahoma* (1979) 441 U.S. 322, 326 and fn. 2 [60 L.Ed.2d 250, 99 S.Ct. 1727].)

 Although dormant commerce clause jurisprudence is far from clear (*Kassel v. Consolidated Freightways Corp.* (1981) 450 U.S. 662, 706 [67 L.Ed.2d 580, 609, 101 S.Ct. 1309] (dis. opn. of Rehnquist, C. J.) (referring to it as "hopelessly confused")), the court has traditionally used a two-tiered approach when determining whether state legislation has exceeded the bounds of its authority under the dormant commerce clause. (*Brown-Forman Distillers Corp. v. New York State Liquor Authority* (1986) 476 U.S. 573, 578–579 [90 L.Ed.2d 552, 559, 106 S.Ct. 2080] (*Brown-Forman*).) A state statute is invalid

per se if it discriminates against interstate commerce in favor of in-state economic interests or if its practical effect is to control conduct beyond the boundaries of the regulating state. (*Healy, supra,* 491 U.S. at p. 336 [105 L.Ed.2d at p. 288]; *Brown-Forman, supra,* 476 U.S. at p. 579 [90 L.Ed.2d at p. 559].) On the other hand, when "a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the court has] examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." (*Brown-Forman, supra,* 476 U.S. at p. 579 [90 L.Ed.2d at p. 560]; *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 178, 90 S.Ct. 844] (*Pike*).) The Supreme Court has noted that while there is no bright line separating these two categories of regulation, "[i]n either situation the critical consideration is the overall effect of the statute on both local and interstate activity." (*Brown-Forman, supra,* 476 U.S. at p. 579 [90 L.Ed.2d at p. 560].)

We therefore consider the effect section 25241 has on interstate commerce. (*United Haulers Ass'n. v. Oneida-Herkimer Solid Waste Mgnt. Auth.* (2nd Cir. 2001) 261 F.3d 245, 255.) The substantive provision of section 25241 prohibits the use of a brand name of geographical significance on any label, packaging material, or advertising, on wine unless the wine qualifies under federal regulations because the grapes used are grown in the area signified. The provision applies to wine produced, bottled, labeled, offered for sale or sold in California. (§ 25241, subd. (b).) The effect of the prohibition is to halt the sale of wine marketed under one of the affected brand names unless the brand name accurately reflects the origin of the grapes used in making the wine.

As noted, the legislative history indicates the Legislature's purpose in enacting section 25241 was to close the regulatory loophole created by the grandfather clause in the federal regulations. As that clause applies only to wine sold, shipped, or delivered for sale or shipment into interstate and foreign commerce (27 U.S.C. § 205(e)), it is clear the Legislature intended section 25241 to halt the sale and shipment of wine into interstate and foreign markets if the wine is labeled or packaged with the misleading brand names specified by the statute. It is therefore clear that section 25241 affects interstate and foreign commerce.

A. *Invalid Per Se*

Bronco argues that section 25241 directly regulates interstate commerce because the statute's practical effect is to regulate commerce wholly outside California's borders. Bronco reasons that since section 25241 applies to wine "produced, bottled, labeled, offered for sale *or* sold in California," it applies to wine that is sold out-of-state if produced, bottled, or labeled in California.

▮▮ The commerce clause prohibits application of a state statute to commerce wholly outside the state's borders. (*Healy, supra,* 491 U.S. at p. 336 [105 L.Ed.2d at p. 288]; *Brown-Forman, supra,* 476 U.S. at pp. 581–582 [90 L.Ed.2d at pp. 561–562]; *Edgar v. MITE Corp.* (1982) 457 U.S. 624, 642 [73 L.Ed.2d 269, 283, 102 S.Ct. 2629].) The court in *Edgar* explained the principle underlying the limitation. "In *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 775 [89 L.Ed. 1915, 65 S.Ct. 1515] (1945), the Court struck down on Commerce Clause grounds a state law where the 'practical effect of such regulation is to control [conduct] beyond the boundaries of the state . . . .' The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, 'any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power.' " (*Id.* at p. 643 [at p. 283], quoting *Shaffer v. Heitner* (1977) 433 U.S. 186, 197 [53 L.Ed.2d 683, 693, 97 S.Ct. 2569].)

These rules have been applied to invalidate price affirmation laws that tied the out-of-state price of goods to the in-state price of the goods (*Healy, supra,* 491 U.S. at p. 337 [105 L.Ed.2d at p. 289]; *Brown-Forman, supra,* 476 U.S. at pp. 579–582 [90 L.Ed.2d at pp 560–561]), to invalidate laws that restricted the interstate movement of goods based on the price paid for them in out-of-state transactions (*Baldwin v. G.A.F. Seelig, Inc.* (1935) 294 U.S. 511, 521 [79 L.Ed. 1032, 1037, 55 S.Ct. 497]; *Lemke v. Farmers Grain Co.* (1922) 258 U.S. 50, 60–61 [66 L.Ed. 458, 465, 42 S.Ct. 244]), and to invalidate laws that required a merchant to seek regulatory approval in one state before undertaking a transaction in another state. (*Edgar v. MITE Corp., supra,* 457 U.S. at pp. 643–646 [73 L.Ed.2d at pp. 284–285]; *ANR Pipeline Co. v. Schneidewind* (6th Cir. 1986) 801 F.2d 228, 236.)

▮▮ By contrast, states are not precluded from regulating the in-state components of an interstate transaction so long as the regulation furthers a legitimate state interest (*A.S. Goldmen & Co. v. New Jersey Bureau of Securities* (3rd Cir. 1999) 163 F.3d 780, 785 [upholding state law authorizing state officials to block the sale of securities from New Jersey to buyers outside the state where the offer is made intrastate]) or regulates an in-state transaction relating to produce destined for interstate commerce. (*Parker v. Brown, supra,* 317 U.S. at pp. 366–367 [87 L.Ed.2d at p. 336] [upholding a state law regulating the production, price, and sale of raisins prior to processing and preparation for shipment into interstate commerce]; *Sligh v. Kirkwood* (1915) 237 U.S. 52 [59 L.Ed. 835, 35 S.Ct. 501] [upholding the prohibition against the sale, shipment or delivery of citrus fruit that was immature or otherwise unfit for consumption].)

▮▮ Because section 25241 by its terms applies to "wine produced, bottled, labeled, offered for sale or sold in California . . . ," it applies only to

transactions that take place within California. Nor does it have the practical effect of directly regulating sales that take place wholly outside of California.

It is Bronco's business practice to sell its wine to wholesalers within California, without regard to its intrastate or interstate destination.[21] Section 25241 applies regardless of whether the wine's ultimate destination is interstate because it applies to wine sold or offered for sale in California. The section also would apply if Bronco chose to sell its wine directly in interstate commerce because its wine is produced, bottled or labeled in California. In either case, section 25241 regulates the in-state portion of an interstate transaction, a regulation that does not exceed the territorial reach of the state. (*A.S. Goldmen & Co. v. New Jersey Bureau of Securities, supra,* 163 F.3d at p. 785.) While section 25241 will undoubtedly affect interstate commerce because of its upstream impact on the price and volume of wine ultimately shipped to out-of-state markets, it does not directly regulate those markets. (*Freedom Holdings, Inc. v. Spitzer* (2nd Cir. 2004) 357 F.3d 205, 220.)

Bronco asserts however, that because the statute applies to wine that is bottled or produced in California, the statute operates extraterritorially by effectively prohibiting the sale and advertising of Bronco wine in national and international markets.[22] As applied to Bronco, we disagree.

Section 25241, subdivision (f) provides an enforcement remedy to the Department to "suspend or revoke the license of any person who produces or bottles wine who violates this section."[23] Because the provision is limited to the producer or bottler of the wine, it does not apply to merchants who sell the wine, whether they are within or without the state.

---

[21] Seventy-two percent of Bronco's wine is shipped to other states and countries, and Bronco's California license as a manufacturer or wine grower authorizes it, among other things, to "export" its wine, as well as to sell its wine to "persons holding wholesaler's . . . licenses . . . and to persons who take delivery of those alcoholic beverages within this state for delivery or use without the state." (§ 23356, subd. (b).)

Although Bronco is authorized to sell its wine directly into interstate and foreign commerce (§ 23356, subd. (b)), Bronco's business practice, as authorized by statute, is to sell all of its wine to California wholesalers who then sell it to California retailers and to wholesalers or retailers outside California.

[22] We decline to reach Bronco's claim section 25241 has an extraterritorial reach by prohibiting it from advertising its Brands in national and international markets because Bronco has not provided us with record citations showing that it does so.

[23] "*The department may suspend or revoke the license of any person who produces or bottles wine who violates this section.* Following notice of violation to the person in possession of the wine and a hearing to be held within 15 days thereafter, if requested by any interested party within five days following the notice, *the department may seize wine labeled or packaged in violation of this section regardless of where found,* and may dispose of the wine upon order of the department. From the time of notice until the departmental determination, the wine shall not be sold or transferred." (§ 25241, subd. (f), italics added.)

We therefore conclude section 25241 does not have an extraterritorial reach.

Relying on *Alliant Energy Corp. v. Bie* (7th Cir. 2003) 330 F.3d 904 and *Shafer v. Farmers Grain Company of Embden* (1925) 268 U.S. 189 [69 L.Ed. 909, 45 S.Ct. 481] (*Shafer*), Bronco also contends the statute is per se invalid because it is a direct regulation of interstate commerce. We disagree.

In *Alliant*, the court considered the validity of a set of Wisconsin statutory provisions regulating the corporate structure and ownership of public utilities operating in the state. The in-state incorporation provision required that a public utility holding company be incorporated in Wisconsin, which in the court's view had the effect of requiring that ultimate ownership of such company lie in a Wisconsin corporation. Applying the *Pike* balancing test rather than a per se test, the court found the regulation was a direct regulation of interstate commerce because "[a]n investment opportunity in a Wisconsin utility is . . . an article of interstate commerce. [Citation.] If ownership of a Wisconsin utility company must lie with a Wisconsin Corporation, a potential article of interstate commerce, i.e., the investment in the utility, is stopped at the border." (*Alliant Energy Corp. v. Bie, supra*, 330 F.3d at pp. 912–913.)

Unlike in *Alliant*, section 25241 does not operate to quarantine Bronco's wine by prohibiting its sale outside of California. (Compare *Hostetter v. Idlewild Bon Voyage Liquor Corp.* (1964) 377 U.S. 324, 325, 333 [12 L.Ed.2d 350, 352, 357, 84 S.Ct. 1293] [invalidated state law prohibiting the sale of tax-free bottled wine and liquor to departing international travelers for delivery in foreign countries].) Bronco is free to sell its wine under different brand names and to use the restricted brand names on wines that meet the grape content requirements. Section 25241 only prohibits Bronco from selling its wine under a brand name that does not correctly reflect the true viticultural area of the grapes used to make the wine. As noted, to the extent that prohibition has an upstream effect on the price and volume of wine sold, it has merely an indirect effect on interstate and foreign commerce.

In *Shafer, supra*, 268 U.S. 189 [69 L.Ed. 909] North Dakota imposed numerous burdensome conditions on the processing, grading, buying, pricing, and profit margins of interstate wheat buyers who purchased the wheat in-state for the sole purpose of shipping to and selling in markets out-of-state. Finding the purchase transactions were interstate commerce, the Supreme Court concluded that by "subjecting the buying for interstate shipment to the conditions and measure of control just shown, the Act directly interferes with and burdens interstate commerce . . . . " (268 U.S. at p. 201 [69 L.Ed. at p. 915].)

*Shafer* was decided at a time when the court applied a mechanical test to determine whether the regulation had a direct or indirect effect on interstate commerce. (*Parker v. Brown, supra,* 317 U.S. at p. 360 [87 L.Ed. at p. 331]; see also *Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n* (1983) 461 U.S. 375, 390 [76 L.Ed.2d 1, 14, 103 S.Ct. 1905]; *Pike, supra,* 397 U.S. at p. 142 [25 L.Ed.2d at pp. 178–179].)[24] Under that test, the courts generally upheld the regulation if it was imposed on transactions that occurred before the introduction of the matter into interstate commerce. (*Parker v. Brown, supra,* 317 U.S. at p. 360 [87 L.Ed. at p. 331].) Because the court in *Shafer* determined the regulations were imposed on the wheat market *after* the wheat entered the stream of interstate commerce, it concluded the statute was a direct regulation of interstate commerce. Having made that determination, the court considered the extent and nature of the regulations, which it found imposed such an unacceptable measure of control that it "directly interfer[ed] with and burden[ed] interstate commerce . . . ." (*Shafer, supra,* 268 U.S. at p. 201 [69 L.Ed. at p. 915].)

 *Shafer* does not compel a different result here because section 25241 regulates in-state activities and transactions that take place before interstate commerce begins, and is therefore an indirect regulation of interstate commerce. Since Bronco sells its wine to wholesalers wholly inside California without distinction whether the wine is to be resold in-state or interstate, its wine has " 'no ascertainable destination without the state.' " (*Pike, supra,* 397

---

[24] More recently, the courts have declined to apply the direct/indirect approach to commerce clause cases. (See *Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n, supra,* 461 U.S. at pp. 390–394 [76 L.Ed.2d at pp. 14–16] [wholesale rates of electricity]; *Complete Auto Transit, Inc. v. Brady* (1977) 430 U.S. 274, 279–280, 288–289 [51 L.Ed.2d 326, 331, 337, 97 S.Ct. 1076] [state taxation].) In *Parker v. Brown, supra,* 317 U.S. at pages 362–363 [87 L.Ed.2d at pp. 332–333], the court explained that "courts are not confined to so mechanical a test . . . . [¶] Such regulations by the state are to be sustained, not because they are 'indirect' rather than 'direct,' [citations] not because they control interstate activities in such a manner as only to affect the commerce rather than to command its operations. But they are to be upheld because upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities, and which, because of its local character, and the practical difficulties involved, may never be adequately dealt with by Congress. Because of its local character also there may be wide scope for local regulation without substantially impairing the national interest in the regulation of commerce by a single authority and without materially obstructing the free flow of commerce, which were the principal objects sought to be secured by the Commerce Clause. [Citations.] There may also be, as in the present case, local regulations whose effect upon the national commerce is such as not to conflict but to coincide with a policy which Congress has established with respect to it." Thus, in *Baltimore Gas & Elec. Co. v. Heintz* (4th Cir. 1985) 760 F.2d 1408 at page 1422, the court applied the *Pike* test, finding the direct/indirect approach "analytically unsound and result-oriented . . . ." (See also *DiSanto v. Pennsylvania* (1927) 273 U.S. 34, 44 [71 L.Ed. 524, 530, 47 S.Ct. 267] (Dis. opn. of Stone, J.) [criticizing the direct/indirect analysis as "too mechanical, too uncertain in its application, and too remote from actualities, to be of value."].)

U.S. at p. 141 [25 L.Ed.2d at p. 178].) Bronco's wine does not enter the stream of interstate commerce until the wholesaler transacts to sell it across state lines. (*Shafer, supra,* 268 U.S. at p. 200 [69 L.Ed. at p. 915; see also *A.S. Goldmen & Co. v. New Jersey Bureau of Securities, supra,* 163 F.3d at p. 787.) Because the in-state activities and transactions are merely preparatory to the sale and shipment of wine in interstate commerce, section 25241 does not directly regulate interstate commerce.

We therefore turn to a *Pike* analysis.

### B. *Pike Balancing Test*

 In *Pike, supra,* 397 U.S. 137 [25 L.Ed.2d 174], the Supreme Court set forth a three-factor balancing test to assess the constitutional validity of a state statute that effects interstate commerce. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation.] If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, *Southern Pacific Co. v. Arizona,* 325 U.S. 761 [89 L.Ed. 1915, 65 S.Ct. 1515], but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens. See, e.g., *Shafer v. Farmers Grain Co.*" (*Id.* at p. 142 [25 L.Ed.2d at p. 178].)

In *Pike,* the court struck down an Arizona statute and order where the statute required that all cantaloupes grown in Arizona and offered for sale must be packed in a manner and type of closed containers approved by a state official. The official issued an order prohibiting a cantaloupe grower from transporting its uncrated cantaloupes from its Arizona ranch to its California packing and processing facility, where the fruit would be shipped to markets nationwide. (*Pike, supra,* 397 U.S. at p. 138 [25 L.Ed.2d at p. 176].) The practical effect of the order was to compel the grower to build a packing facility in Arizona so that the state could regulate an operation that otherwise was performed outside the state. (*Id.* at p. 141 [25 L.Ed.2d at p. 178].)

Applying its three-part balancing test, the court recognized the state's interest in protecting and enhancing the reputation of Arizona growers by prohibiting deceptive packaging. While recognizing the interest as legitimate, the court concluded it did not outweigh the burden on interstate commerce. The court reasoned the grower's cantaloupes were of exceptionally high

quality, are processed in California and bear the name of the California packer rather than identifying them as Arizona fruit. (*Pike, supra,* 397 U.S. at pp. 143–144 [25 L.Ed.2d at p. 179].) The purpose of the order forbidding the grower to pack its fruit outside Arizona was not to keep the reputation of its growers unsullied, but to compel the use of an Arizona label to enhance the reputation of the Arizona fruit through the reflected goodwill of the company's superior produce. The court concluded that "the State's tenuous interest in having the company's cantaloupes identified as originating in Arizona cannot constitutionally justify the requirement that the company build and operate an unneeded $200,000 packing plant in the State." (*Id.* at p. 145 [25 L.Ed.2d at p. 180].) In so doing, the court characterized Arizona's interest as minimal, and remarked that the consequence of the order could perhaps be tolerated if a more compelling state interest were involved. (*Id.* at p. 146 [25 L.Ed.2d at p. 181].)

### 1. *The State's Interests*

Respondent and intervener contend section 25241 protects in-state consumers from misleading wine labels, deters the establishment of in-state fraudulent enterprises while protecting honest wine vendors, and protects the integrity and reputation of California's vital premier wine industry.

These are legitimate interests. California has a compelling interest in preserving an intrastate business climate free of fraud and deceptive business practices (*Diamond Multimedia Systems, Inc. v. Supreme Court* (1999) 19 Cal.4th 1036, 1064 [80 Cal.Rptr.2d 828, 968 P.2d 539]) and certainly may protect its own residents from such business practices. (*CTS Corp. v. Dynamics Corp. of America* (1987) 481 U.S. 69, 93 [95 L.Ed.2d 67, 88, 107 S.Ct. 1637]; *A.S. Goldmen & Co. v. New Jersey Bureau of Securities, supra,* 163 F.3d at p. 788.) The state also may protect the integrity of its markets by prohibiting false statements and transactions (*A.S. Goldmen, supra,* at p. 788), may protect the reputation of one of its premier food industries by prohibiting deceptive packaging (*Pike, supra,* 397 U.S. at p. 143 [25 L.Ed.2d at p. 179] or the sale and delivery of fruit unfit for consumption (*Sligh v. Kirkwood, supra,* 267 U.S. 52 [59 L.Ed. 835]), and may require that produce packaged in-state, be packaged in a particular type of receptacle. (*Pacific States Box & Basket Co. v. White* (1935) 296 U.S. 176 [80 L.Ed. 138, 56 S.Ct. 159].) Additionally, the state has a legitimate interest in "maximizing the financial return" to one of its industries. (*Pike, supra,* 397 U.S. at p. 143 [25 L.Ed.2d at p. 179]; *Parker v. Brown, supra,* 317 U.S. at pp. 363–365 [87 L.Ed. at pp. 333–335].)

California's interest in protecting the reputation of its premier wine industry is weightier than the interest asserted in *Pike* because California

seeks to protect the value of a superior product from the misleading use of brand names on an inferior product. As discussed, grapes from the Napa Valley are of significantly higher quality than grapes grown in Lodi and Stanislaus Counties. Napa Valley has a national and international reputation for producing grapes and wine of the highest quality. (§ 25241, subd. (a)(1).) Because Napa Valley wine stands at the forefront of the state's wine industry,[25] the Legislature has sought to protect the Napa Valley name by ensuring that wine bearing the name Napa or Napa appellation names are of the same high quality associated with grapes from that area.

■ Because the state has legislated to further legitimate interests, the enactment carries a presumption of constitutional validity. (*Pike, supra,* 397 U.S. at p. 143 [25 L.Ed.2d at p. 179].) The court cannot invalidate a statute enacted pursuant to the state's police power unless it has no reasonable relation to a legitimate purpose accomplished by the enactment. (*Sligh v. Kirkwood, supra,* 237 U.S. at p. 61 [59 L.Ed. at pp. 838–839].)

Bronco concedes these are valid state interests in the abstract but argues that the Brands do not threaten those interests because the federal regulations are adequate to prevent consumer deception and the record fails to show consumers are actually being misled by its labels. We disagree with Bronco.

■ Whether a statute is necessary to further the public interest is primarily a legislative determination the courts will not second-guess. (*CTS Corp. v. Dynamics Corp. of America, supra,* 481 U.S. at p. 92 [95 L.Ed.2d at p. 87]; *Pacific Northwest Venison Producers v. Smitch* (9th Cir. 1994) 20 F.3d 1008, 1017.) As noted, the federal regulations created an exception to the general rule, which generally prohibits the use of misleading brand names of viticultural significance. (27 C.F.R. § 4.39(i)(1).) The exception, which we have referred to as the "grandfather clause," authorizes Bronco to use the brand names prohibited by section 25241. (See 27 C.F.R. § 4.39(i)(2).) Section 25241 was intended to close the loophole left by the exception because the Legislature found it inadequate to protect the state's interests. (*Bronco Wine, supra,* 33 Cal.4th at p. 953.)

As previously discussed, section 25241 contains findings made by the Legislature, including the finding that consumers were confused and deceived by the misleading practice of using Napa appellations on labels and packaging materials, and in advertising for wines made from grapes that do not

---

[25] The annual wine business of Napa Valley is approximately $4 billion, while the total annual business of the state wine industry is $33 billion. Napa Valley accounts for about 12 percent of the wine business in this state while producing about 4 percent of the wine. If Bronco reaches full production at its new bottling facility, its annual output would be twice that produced annually by Napa Valley wineries. (See *Bronco Wine, supra,* 33 Cal.4th at p. 950.)

qualify for a Napa County brand name, and that the prohibition was necessary to eliminate this misleading practice. (§ 25241, subd. (a)(2), (3).)

■■■ Because, as we found in part I, the record is adequate to support those findings, the Legislature's determination is binding on us. (*CTS Corp. v. Dynamics Corp. of America, supra,* 481 U.S. at p. 92 [95 L.Ed.2d at p. 87].) The state need not prove actual fraud, but may enact legislation that serves the prophylactic purpose of preventing deception. (*A.S. Goldmen & Co. v. New Jersey Bureau of Securities, supra,* 163 F.3d at p. 788.)

Bronco further argues that the state's interest in protecting against misleading brand names is significantly undermined by the statute's underinclusiveness. We have considered and rejected this argument in part I and reject it here for the same reasons. The Legislature reasonably found that vintners using brand names of geographic significance for areas within Napa County do not pose the same threat to the region's reputation for premier wine because the vintners produce wine with grapes from the area which are therefore of the same high caliber. Rather than undermining the area's reputation, such wines contribute to and share in that reputation.

Bronco also argues that the state's interests are undermined by the Legislature's own findings. According to Bronco, Napa County's reputation as a premier viticultural area was established during a time when brand names used Napa County place names although the wines were made with non-Napa-County wines, and thus did not harm the reputation of the Napa County viticultural areas.

Bronco has not provided a record cite to support this claim. We note that, while the prior owner of the Napa Ridge brand used that name and label for wines made from grapes grown in several non-Napa-County areas as well as from Napa County, "[a]ll of the wines previously marketed by the prior owner under the Napa Creek Winery brand and most wines previously marketed by the prior owner under the Rutherford Vintners brand had been made from Napa County grapes." (*Bronco Wine Co., supra,* 33 Cal.4th at p. 951.) Based upon the record, the Legislature could reasonably find that wines previously made with non-Napa-Valley grapes, although marketed under Napa Valley brand names, were so few in number and/or low in volume, they did not impact the reputation or integrity of wine made from grapes grown in Napa Valley.

### 2. *Burden on Interstate Commerce*

Bronco does not contend that section 25241 discriminates against interstate commerce or that it is less than evenhanded in its effect. Nor could it. The

section applies equally to wines destined for intrastate and interstate commerce. Indeed, section 25241 is the result of a purely intrastate conflict between competing local wineries.[26]

Bronco contends however, that section 25241 will effectively remove from interstate and foreign commerce the vast majority of labels bearing its three affected Brands, thereby depriving it of its brand equity, while depriving foreign consumers of its award-winning value priced wine.

While we agree the statute has an effect on interstate commerce, the effect does not outweigh the state's weightier interests. As respondent argues, section 25241 does not impose a quarantine by prohibiting the sale of Bronco's wine nor the use of its affected Brands. (See *Hostetter v. Idlewild Bon Voyage Liquor Corp., supra,* 377 U.S. 324 [12 L.Ed.2d 350].)

To comply with section 25241, Bronco may use its affected brand names on wine produced with Napa County grapes. It may continue to sell its award-winning, reasonably priced or "value" wine under other brand names that are not misleading. The effect of the statute will be to deprive Bronco of the brand equity it has built up with its value wine. It may also create temporary consumer confusion until Bronco obtains new brand names and builds up brand equity for its newly labeled wine. As a consequence, section 25241 will undoubtedly have an effect on the volume and price of the wine sold in interstate and foreign commerce.

However, the United States Supreme Court has upheld regulations aimed at matters of local concern that have the effect of restricting the volume of goods shipped into interstate commerce. (*Parker v. Brown, supra,* 317 U.S. at pp. 363–364 [87 L.Ed. at p. 333] [state law market stabilization scheme regulated the production, price, and sale of raisins prior to processing and preparation for shipment into interstate commerce]; *Sligh v. Kirkwood, supra,* 237 U.S. 52 [59 L.Ed. 835] [state law prohibited the sale, shipment or delivery of citrus fruit that was immature or otherwise unfit for consumption].)

Although application of section 25241 to Bronco may have a significant adverse financial impact on Bronco, that is not dispositive. The main concern

---

[26] By contrast, in *Granholm v. Heald* (2005) 544 U.S. 460 [161 L.E.2d 796, 125 S.Ct. 1885], the Supreme Court recently invalidated Michigan and New York state laws prohibiting out-of-state wineries from selling directly to consumers while allowing in-state wineries to do so. The high court found these laws discriminated against interstate commerce by giving in-state wineries a competitive advantage over out-of-state wineries and that such discrimination is not authorized or permitted by the Twenty-first Amendment. (*Granholm, supra,* 544 U.S. at p. ____ [161 L.Ed.2d at p. 822, 125 S.Ct. 1885].) As stated, section 25241 does not discriminate between out-of-state and in-state wineries nor does it stop the sale of wine at the border.

identified in *Pike*, economic protectionism of state industries (*Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n, supra,* 461 U.S. at p. 394 [76 L.Ed.2d at p. 17]), is not implicated here. Section 25241 does not take aim at out-of-state wineries. To the contrary, its aim is to protect some intrastate wineries from other intrastate wineries (compare *Pete's Brewing Co. v. Whitehead* (1998) 19 F.Supp.2d 1004, 1012–1013 [invalidated a labeling regulation that discriminated against interstate commerce by weakening the brand equity of interstate beer brewers]), and as stated, California may regulate the business practices of one of its industries to maximize the return to that industry. (*Parker v. Brown, supra,* 317 U.S. 341 [87 L.Ed. 315].) Because section 25241 is designed to protect the economic interests of intrastate wineries from other intrastate wineries, application of section 25241 to Bronco, an intrastate winery will not disadvantage out-of-state economic interests in favor of intrastate economic interests. (Compare *Pike, supra,* 397 U.S. at p. 145 [25 L.Ed.2d at p. 180] [labeling regulation effectively required the closure of an out-of-state packing shed].)

Bronco has failed to establish the actual impact that section 25241 will have on interstate commerce. To that end, Bronco must show specific details as to how the costs of an enactment burden interstate commerce. (*S.D. Myers, Inc. v. City and County of San Francisco* (9th Cir. 2001) 253 F.3d 461, 471.) Because Bronco has presented no evidence to show the actual impact on its interstate sales, we are unable to effectively quantify the burden on interstate commerce. While Bronco may incur increased costs either to develop new brand names and brand equity for wine sourced outside of Napa County or increased costs to purchase Napa County grapes for use with its existing labels, the costs are offset by the fact Bronco also will incur them in connection with its intrastate sales, which Bronco does not contest. While compliance with section 25241 may cause consumer confusion caused by the sale of Bronco's wine under new brand names, the inconvenience to consumers will only be temporary.

We conclude that the state's interests in protecting the reputation and integrity of its vital wine industry from the use of misleading brand names outweighs the incidental effect on interstate and foreign commerce.

### 3. *Lesser Alternatives*

The last issue to consider is whether the state's interests could be promoted with a lesser impact on interstate commerce. (*Pike, supra,* 397 U.S. at p. 142 [25 L.Ed.2d at p. 178].) Bronco contends respondents have failed to show there are alternatives with a lesser impact on interstate commerce, while suggesting that any possible consumer confusion could be eliminated by

gradually phasing in the provisions of the legislation, requiring additional label disclosures, or engaging in additional advertising and promotion of Napa County appellations.

Bronco is in error because it is the petitioner, not respondent, who bears the burden of proof. As the party challenging the constitutional validity of section 25241, Bronco has the burden of proving that alternatives which it proposes are *equally effective* in eliminating the misleading and confusing nature of the brand names. (*Pacific Northwest Venison Producers v. Smitch, supra,* 20 F.3d at p. 1017; *Maine v. Taylor* (1986) 477 U.S. 131, 146–148 [91 L.Ed.2d 110, 126, 106 S.Ct. 2440].)

Bronco has failed to meet this burden of proof. It has provided no example of such a label nor studies showing that a different label would be equally effective in dispelling consumer confusion. On the other hand, BATF officials have found that the brand name, which is usually the most prominent item on a wine label, conveys to the consumer the origin of the wine grapes. In 1986, the BATF determined that because the brand name is so prominent, placing additional disclosures on such a label would not effectively offset the misleading impression that could be caused by a brand name of geographic significance when the wine is not made with grapes from the geographic area named. (51 Fed. Reg., *supra,* p. 20481.) By enacting section 25241, the California Legislature impliedly made the same finding, and we may not second-guess its empirical judgment. (*Pacific Northwest Venison Producers v. Smitch, supra,* 20 F.3d at p. 1017.)

Nor is there any evidence to show that phasing in section 25241 would be equally effective. To the contrary, delaying its application will allow Bronco to continue the very practice the Legislature has found misleading. Similarly, there is no evidence to show that an advertising campaign to promote Napa County appellations would have as broad or direct a reach as a change in Bronco's labels.

For the foregoing reasons we conclude that the state's interests in protecting California wine consumers from misleading brand names and preserving and maintaining the reputation and integrity of its wine industry as a result of the use of such brand names in out-of-state and foreign markets outweigh the indirect and temporary effect of section 25241 on out-of-state wine consumers. Accordingly, we hold that section 25241 does not violate the commerce clause.

## III

### Fifth Amendment Takings Clause

Bronco contends section 25241 constitutes an uncompensated "taking" in violation of the takings clause of the Fifth Amendment.

Bronco argues that section 25241 constitutes a total taking of its affected COLA's because it effectively nullifies the total value of the COLA's issued for any label bearing the Brands with an appellation of origin outside Napa County. The statute effects a taking of its Brands because it fails to further a legitimate state interest given the extensive federal regulatory scheme and the absence of actual deception.[27] It challenges the application of section 25241 to Bronco on the grounds it substantially deprives it of the economic value of its brand equity in these Brands.

Respondent and interveners respond that COLA's are not property subject to the takings clause and section 25241 furthers legitimate state interests and restricts only one of the uses of Bronco's Brands. They also argue that Bronco's challenge is not ripe for review because no final decision has been issued against Bronco and it has failed to seek compensation by eminent domain proceedings.

We hold that section 25241 does not effect a taking of Bronco's COLA's because, standing alone, COLA's are not property subject to Fifth Amendment protection and the statute does not effect a taking of Bronco's brand equity under *Penn Central Transportation Company v. New York City* (1978) 438 U.S. 104, 122 [57 L.Ed.2d 631, 647, 98 S.Ct. 2646] (*Penn Central*).)[28]

■ The takings clause of the Fifth Amendment prohibits the taking of "private property . . . for public use, without just compensation." It is applicable to the states through the Fourteenth Amendment. (*Chicago, B. & Q.R. Co. v. Chicago* (1897) 166 U.S. 226, 241 [41 L.Ed. 979, 986, 17 S.Ct. 581]; *Penn Central, supra,* 438 U.S. at p. 122 [57 L.Ed.2d at p. 647].) Its purpose is to prohibit " '[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole . . . .' " (*Penn Central, supra,* at p. 123 [57 L.Ed.2d at p. 648], quoting *Armstrong v. United States* (1960) 364 U.S. 40, 49 [4 L.Ed.2d 1554, 1561, 80

---

[27] In *Lingle v. Chevron* (2005) 544 U.S. 528, ___ [161 L.Ed.2d 876, 125 S.Ct. 2074], the Supreme Court most recently held that the "substantially advances" formula is not a valid method of identifying regulatory takings under the Fifth Amendment.

[28] Because we so hold, we do not address Bronco's claim that the statute does not advance a legitimate state interest within the meaning of the public purpose requirement of the takings clause.

S.Ct. 1563].) Although a taking often occurs when the government physically invades or confiscates property, the Supreme Court has long recognized that economic regulation may constitute a taking if it "goes too far." (*Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 326, 43 S.Ct. 158].)

The claimant must establish (1) it has a protectable property interest, (2) there has been a taking of the property, and (3) the taking was for a public purpose. (*Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1000–1001 [81 L.Ed.2d 815, 831, 104 S.Ct. 2862]; *American Pelagic Fishing Co. v. United States* (Fed. Cir. 2004) 379 F.3d 1363, 1372 (*American Pelagic*); *Conti and Conti Corp. v. United States* (Fed. Cir. 2002) 291 F.3d 1334, 1339 (*Conti*).)

### A. COLA's

Bronco contends its COLA's constitute a definite "bundle of rights" that qualify as compensable property under the Fifth Amendment. Respondent and intervener respond that a COLA is like a license or permit, which generally is not considered property within the meaning of the takings clause. We agree that, standing alone, COLA's are not property protected by the takings clause because a COLA constitutes but one strand in the bundle of rights possessed by the owner of a brand name.

■ The takings clause protects real property (*Lucas v. S. C. Coastal Council* (1992) 505 U.S. 1003, 1019 [120 L.Ed.2d 798, 815, 112 S.Ct. 2886]), tangible personal property (*Andrus v. Allard* (1979) 444 U.S. 51, 65 [62 L.Ed.2d 210, 222, 100 S.Ct. 318] (*Andrus*)) and intangible property. (*Ruckelshaus v. Monsanto Co.*, *supra*, 467 U.S. at pp. 1003–1004 [81 L.Ed.2d at pp. 832–833] (trade secrets).) Whether something is protected property turns on the " 'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, [which] define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." (*Conti, supra*, 291 F.3d at p. 1340, quoting *Lucas, supra*, 505 U.S. at p. 1030 [120 L.Ed.2d at p. 822].) Such property interests may derive from federal law (*Conti, supra*, 291 F.3d at pp. 1340–1341, and fn. 4) or state law. (*Lucas, supra*, 505 U.S. 1003 [120 L.Ed.2d 798].)

The right to exclude others, and to sell, assign or otherwise transfer ownership are traditional hallmarks of property. (*Ruckelshaus v. Monsanto Co., supra*, 467 U.S. at p. 1002 [81 L.Ed.2d at p. 832]; *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435–36 [73 L.Ed.2d 868, 882, 102 S.Ct. 3164] [describing rights to dispose of property and to sell it as part of the owner's bundle of property rights in a thing].)

In determining whether permits or licenses are property, the courts consider whether the permit or license is transferable, the extent to which the government has the right to regulate the underlying activity, or to revoke, suspend, or modify the permit or license, and whether there has been a legislative or regulatory expression that issuance of the permit does not create a property right. (*American Pelagic,* 379 F.3d at p. 1374; *Conti, supra,* 291 F.3d at pp. 1341–1342].)

Considering these hallmarks of property, the courts generally have found that licenses and permits do not constitute property rights for purposes of the takings clause. (See *American Pelagic, supra,* 379 F.3d at p. 1374 [fishing permit]; *Federal Lands Legal Consortium v. United States* (10th Cir. 1999) 195 F.3d 1190, 1201 [grazing permit]; *United States v. Fuller* (1973) 409 U.S. 488, 493 [35 L.Ed.2d 16, 22, 93 S.Ct. 801] [grazing permits]; *Conti, supra,* 291 F.3d 1334, 1339 [fishing permit]; *Acton v. United States* (9th Cir. 1968) 401 F.2d 896, 899 [uranium prospecting permit]; *Burns Harbor Fish Co. v. Ralston* (S.D. Ind. 1992) 800 F.Supp. 722, 728 [fishing permit].) However, where a license bears the hallmarks of property, it has been held to be a protectable property right. (See *Jackson v. United States* (1952) 122 Ct.Cl. 197, 206 [103 F.Supp. 1019, 1020] [fishing license was alienable and conferred exclusive fishing rights].)

In *Cabo Distributing Co., Inc. v. Brady* (N.D.Cal. 1992) 821 F.Supp. 601, 609, the court held that a COLA is a protected property interest for purposes of the due process clause, requiring procedural due process before it may be revoked. The court in *Hornell Brewing Co. v. Brady* (E.D.N.Y. 1993) 819 F.Supp. 1227, 1244, citing to *Cabo,* assumed without deciding that the COLA at issue was property for purposes of the takings clause. Similarly, in *Bronco Wine Co. v. United States Dept. of Treasury* (E.D.Cal. 1996) 997 F.Supp. 1309, 1316, the court stated in dicta that since a COLA is property for purposes of due process analysis, it must also qualify for Fifth Amendment protection.

Contrary to the assumption in *Bronco Wine Co. v. United States Dept. of Treasury, supra,* 997 F.Supp. at page 1316, the due process and takings clause concepts of property are not coterminous. The due process clause recognizes a wider range of interests in property. (*Pro-Eco v. Bd. Of Commissioners* (7th Cir. 1995) 57 F.3d 505, 511–512; *Federal Lands Legal Consortium v. United States, supra,* 195 F.3d at p. 1197.)

As noted, a COLA is a certificate of label approval issued by the BATF that authorizes the bottling or packing of wine for introduction into interstate commerce under an approved label. (27 C.F.R. § 13.11 (2001).) The

issuance, denial, and revocation of COLA's are governed by federal regulations. (27 C.F.R. §§ 13.1–13.92 (2002).) The regulations specify the information on the label which identifies the wine and the bottling company and informs consumers about the contents of the wine. (27 C.F.R. § 4.32 (1991); *Cabo Distributing Co. v. Brady, supra,* 821 F.Supp. at p. 609.) Wine may not be bottled, sold, or shipped in interstate commerce unless federal officials first issue a COLA. (27 C.F.R. §§ 4.30(a), 4.50(a) (2000).)[29] A winery which desires to use a particular label must submit an application that includes the complete set of the labels to be used. (27 C.F.R. §§ 13.11, 13.21 (2001).) The application and accompanying labels are reviewed by a BATF official, who must issue a COLA if the application "complies with applicable laws and regulations . . . ." (27 C.F.R. § 13.21(a) (2001).)

 Although a COLA is issued for a potentially unlimited period of time, it may be revoked upon a finding the label or bottle is not in compliance with the applicable laws and regulations (27 C.F.R. § 13.41 (2001); see *Bronco Wine Co. v. United States Dept. of Treasury, supra,* 997 F.Supp. 1309) or by operation of law or regulation. (27 C.F.R. § 13.51 (2002).) If a COLA is revoked for lack of compliance, the holder is entitled to notice and a hearing. (27 C.F.R. §§ 13.42, 13.43 (2001); *Cabo Distributing Co., Inc. v. Brady, supra,* 821 F.Supp. at p. 609.) If a COLA is revoked by operation of law or regulation, no notice or hearing is required. The holder must voluntarily surrender its COLA. (27 C.F.R. § 13.51 (2002).)

According to the BATF, a COLA "was never intended to convey any type of proprietary interest to the certificate holder. On the contrary . . . [the COLA application] provides that 'This certificate is issued for ATF use only. This certificate does not constitute trademark protection.' . . . The certificate of label approval is a statutorily mandated tool used to help ATF in its enforcement of the labeling requirements of the FAA Act." (64 Fed. Reg. 2122, 2123 (Jan. 13, 1999).) As the California Supreme Court recently found in *Bronco Wine,* COLA's do not confer "a 'right' on the holder to market wines in interstate or foreign commerce . . . ." (*Bronco Wine, supra,* 33 Cal.4th at p. 996.)

 Thus, a COLA does not constitute property under the takings clause because wine labels are highly regulated, must be approved before wine is shipped in interstate or foreign commerce and serves only as an enforcement tool that may be revoked by BATF officials upon modification of BATF regulations.

---

[29] By regulation, California also requires that the permittee responsible for labeling have a valid COLA obtained from the United States Treasury Department. (Cal. Code Regs., tit. 17, § 17075(a).)

Nevertheless, Bronco argues that COLA's are property because they grant exclusive rights, only the owner of a COLA may use an approved label on bottled wine, and they are alienable and assignable.

Bronco is correct that COLA's are exclusive and transferable. Indeed, as part of the purchase of the brand name "Napa Ridge," Bronco acquired the COLA's for the labels using that brand name. It is also true that a COLA has some of the aspects of property.

However, its use and value are inseparably linked to the brand name displayed on the label. A COLA is but one specific use of a brand name. While a brand name has long been considered protected property within the meaning of the takings clause (*Jacob Siegel Co. v. Federal Trade Commission* (1946) 327 U.S. 608, 612 [90 L.Ed. 888, 892, 66 S.Ct. 758]), a COLA is merely one "part of the entire bundle of rights possessed by the owner" of the brand name. (See *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 501 [94 L.Ed.2d 472, 498, 107 S.Ct. 1232] (*Keystone*); *Andrus, supra,* 444 U.S. at p. 65 [62 L.Ed.2d at p. 222].) A COLA is assignable,[30] but only in connection with the sale of a brand name. Although a COLA confers exclusive rights to use a particular label, it does not authorize the exclusive use of a brand name. As Bronco notes, it is entitled to additional COLA's for its affected brand names and the three brand names at issue appear collectively on hundreds of COLA's issued over the years. Thus, no one COLA governs the use and value of a particular brand name.

Accordingly, a COLA is not entitled to protection under the takings clause apart from its connection and value to the brand name for which it is issued.

B. *Brand Equity*

Bronco contends section 25241 works a partial regulatory taking under *Penn Central* because it substantially deprives it of the value of its brand equity by pricing its Brands out of the market for value wines. We disagree.

1. *Ripeness*

Preliminarily, we dispense with the contention the claim is an as-applied challenge that is unripe for review because Bronco failed to obtain a final decision regarding its Brands and failed to seek compensation by inverse condemnation proceedings.

---

[30] By federal regulation, basic permits issued by the BATF for importers, producers, bottlers, and wholesalers of wine are not transferable. (27 C.F.R. §§ 1.20–1.22, 1.44 (1999).) The federal regulations impose no such restriction on COLA's.

While a facial challenge is generally ripe the moment the challenged regulation is passed (*Suitum v. Tahoe Regional Planning Agency* (1997) 520 U.S. 725, 736, fn. 10 [137 L.Ed.2d 980, 991, 117 S.Ct. 1659]), a claimant making an as-applied claim must meet two requirements before seeking relief in federal court under the takings clause. It must establish that (1) the government entity charged with implementing the regulation has reached a final decision regarding how the property owner will be allowed to develop his property and (2) the property owner must "seek compensation through the procedures the State has provided for doing so." (*Williamson County Regional Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 186, 194 [87 L.Ed.2d 126, 139, 143, 105 S.Ct. 3108].)

Generally the ripeness issue arises in land use takings cases where the property owner has failed to submit a revised plan that might be approved by regulators. (*Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.* (1981) 452 U.S. 264, 275 [69 L.Ed.2d 1, 15, 101 S.Ct. 2352]; *Williamson County Regional Planning Comm'n v. Hamilton Bank, supra,* 473 U.S. at p. 186 [87 L.Ed.2d at p. 141]; *Penn Central, supra,* 438 U.S. at pp. 136–137 [57 L.Ed.2d at p. 656].) The final decision requirement informs the court of " 'the nature and extent of [the] permitted development' " before it adjudicates the constitutionality of the regulation. (*Lucas v. S.C. Coastal Council, supra,* 505 U.S. at p. 1011 [120 L.Ed.2d at p. 810].)

Neither requirement applies in this case. Although the parties characterize Bronco's challenge as an as-applied challenge, it is more in the nature of a preenforcement facial challenge to section 25241 because Bronco claims the mere enactment of the statute operates as a taking of its brand equity. (See *Keystone, supra,* 480 U.S. at pp. 494–495 [94 L.Ed.2d at pp. 494–495].) The final decision requirement is inapplicable because, unlike many land use regulations that authorize variances, section 25241 provides no discretionary exceptions to its enforcement (see *Lucas v. S.C. Coastal Council, supra,* 505 U.S. at p. 1011 [120 L.Ed.2d at p. 809]), and the enforcing agency has advised Bronco by letter that if Bronco continues to use its brand names in violation of section 25241, the agency will enforce the statute.

Nor must Bronco exhaust a state remedy. The rule applies to limit federal court jurisdiction to hear premature takings claims. (*Williamson County Regional Planning Comm'n. v. Hamilton, supra,* 473 U.S. at pp. 194–195 [87 L.Ed.2d at p. 144].) Here, Bronco has invoked our original jurisdiction (Cal. Const., art VI, § 10), seeking injunctive and declaratory relief. At issue is the constitutional validity of the statute, not the amount owed under the takings clause. We therefore address the merits of Bronco's claim.

## 2. *The Merits*

■ The Supreme Court has employed a two-tiered framework for the analysis of a takings claim. A categorical analysis is used when there has been a physical invasion or appropriation of the property (*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency* (2002) 535 U.S. 302, 322 [152 L.Ed.2d 517, 540, 122 S.Ct. 1465], or a regulatory taking of all economically beneficial uses of the property. (*Lucas v. S.C. Coastal Council, supra,* 505 U.S. at p. 1015 [120 L.Ed.2d at p. 812]; *Lingle v. Chevron, supra,* 544 U.S. at p. ___ [161 L.Ed.2d at p. 887].) An ad hoc factual inquiry is made for regulatory action that diminishes but does not destroy the value of property by restricting its use. (*Ruckelshaus v. Monsanto Co., supra,* 467 U.S. at p. 1005 [81 L.Ed.2d at p. 834]; *Penn Central, supra,* 438 U.S. at p. 124 [57 L.Ed.2d at p. 648]; *Andrus, supra,* 444 U.S. at pp. 65–66 [62 L.Ed.2d at p. 223].) The court has identified three factors of significance. "Primary among those factors are 'the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' [Citation.] In addition, the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred." (*Lingle v. Chevron, supra,* 544 U.S. at p. ____ [161 L.Ed.2d at p. 888]; see *Penn Central, supra,* 438 U.S. at p. 124 [57 L.Ed.2d at p. 648]; *Keystone, supra,* 480 U.S. at p. 495 [94 L.Ed.2d at p. 494].) The court may dispose of a takings claim on the basis of one or two of these factors. (*Maritrans Inc. v. United States* (Fed. Cir. 2003) 342 F.3d 1344, 1359 [where the nature of the governmental action and the economic impact of the regulation did not establish a taking, the court need not consider investment-backed expectations]; *Ruckelshaus v. Monsanto Co., supra,* 467 U.S. at p. 1005 [81 L.Ed.2d at p. 834] [disposing of takings claim relating to trade secrets on absence of reasonable investment-backed expectations]; see also *Andrus, supra,* 444 U.S. at pp. 65–68 [62 L.Ed.2d at pp. 222–224].)

■ In considering the character of the governmental action, the court has said that a taking more readily may be found when the interference with property is characterized as a physical invasion by the government rather than when it arises "from some public program adjusting the benefits and burdens of economic life to promote the common good." (*Penn Central, supra,* 438 U.S. at p. 124 [57 L.Ed.2d at p. 648].) " '[A]ll property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.' " (*Keystone, supra,* 480 U.S. at pp. 491–492 [94 L.Ed.2d

at p. 492].) Legislation prohibiting a particular use will be upheld as a valid exercise of the police power where it promotes " 'the health, safety, morals, or general welfare . . . .' " (*Penn Central, supra,* 438 U.S. at p. 125 [57 L.Ed.2d at p. 649].)

Pertinent to the present case, the state has traditionally exercised its police power to protect the safety and integrity of its produce (*Florida Lime & Avocado Growers v. Paul* (1963) 373 U.S. 132, 146 [10 L.Ed.2d 248, 259, 83 S.Ct. 1210]) and to protect consumers from fraudulent or otherwise harmful business practices. (*CTS Corp. v. Dynamics Corp. of America, supra,* 481 U.S. at p. 92 [95 L.Ed.2d at p. 87]; *A.S. Goldmen & Co. v. New Jersey Bureau of Securities, supra,* 163 F.3d at p. 788; *Diamond Multimedia Systems, Inc. v. Supreme Court, supra,* 19 Cal.4th at p. 1064.)

Here, the nature of the governmental action does not entail the physical confiscation of Bronco's property. Section 25241 applies uniformly to prohibit the use of a brand name that is misleading to consumers and threatens to undermine the valuable reputation of California's premier wine growing region. In so doing, the Legislature has engaged in an exercise of its police power.

We will not reweigh the evidence relied on by the Legislature (*Maritrans v. United States, supra,* 342 F.3d at p. 1357) nor will we engage in a "least restrictive alternative" analysis, nor consider the fact the regulation is somewhat overinclusive or underinclusive. (*Keystone, supra,* 480 U.S. at p. 487, fn. 16 [94 L.Ed.2d at p. 489].)

When considering the economic impact of a regulatory statute we must consider the property in the aggregate. (*Keystone, supra,* 480 U.S. at p. 497 [94 L.Ed.2d at p. 496]; *Andrus, supra,* 444 U.S. at pp. 65–66 [62 L.Ed.2d at p. 223]; *Penn Central, supra,* 438 U.S. at pp. 130–131 [57 L.Ed.2d at p. 652].) A valid exercise of the police power does not constitute a taking when the regulation only diminishes rather than eliminates property value (*Penn Central, supra,* 438 U.S. at p. 131 [57 L.Ed.2d at pp. 652–653]; *Andrus, supra,* 444 U.S. at p. 66 [62 L.Ed.2d at p. 223]), or prohibits the property's most beneficial use. (*Andrus, supra,* 444 U.S. at pp. 65–66 [62 L.Ed.2d at p. 223]; (*Maritrans Inc. v. United States, supra,* 342 F.3d at pp. 1356–1359 [restriction on use of single hull tank barge on navigable waters is not a taking]; *Conti, supra,* 291 F.3d at pp. 1343–1344 [ban on the use of draft gillnet swordfishing is not a taking of vessel, gillnets, and related gear].)

In *Andrus, supra,* 444 U.S. 51 [62 L.Ed.2d 210], Congress passed two environmental acts designed to prevent the destruction of a species of

birds by prohibiting the taking, possessing, buying, or selling of a bird, dead or alive, whole, or in part. The Secretary of the Interior promulgated regulations prohibiting the commercial transaction in parts of birds legally killed before the birds were protected by the acts. Appellees, in the business of trading Indian artifacts that included the feathers of protected birds, brought suit for declaratory and injunctive relief alleging the regulations constituted a taking. The Supreme Court disagreed, saying "a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety. [Citations.] In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds." (*Id.* at pp. 65–66 [62 L.Ed.2d at pp. 222–223].)

 The court in *Andrus* also rejected the argument the regulations effected a taking because they prevented the most profitable use of the property. "[L]oss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." (444 U.S. at p. 66 [62 L.Ed.2d at p. 223].)

*Andrus* is dispositive. Section 25241 does not effect a taking of Bronco's brand equity. It does not bar Bronco from using its Brands under all circumstances nor has Bronco established the statute has destroyed the substantial economic value of its Brands. Bronco may use its Brands for wine made with grapes grown in the geographic area named and may continue to sell its value wine under brand names that are not geographically misleading.

As we have stated, Bronco's right to use its Brands, as authorized by its COLA's, is merely one of the rights in the bundle of rights it possesses. Bronco concedes that much. It claims however, that it will lose some of its market share which, in turn, will reduce its profits to some unknown degree. The argument does not succeed. The possibility that Bronco's future profits may be diminished does not entitle it to "just compensation" under the Fifth Amendment. (*Andrus, supra*, 444 U.S. at p. 66 [62 L.Ed.2d at p. 223].)

For the foregoing reasons we hold that section 25241 does not effect a taking of Bronco's COLA's or its brand equity in the Brands.

## DISPOSITION

The petition for writ of mandate seeking to enjoin respondents from enforcing section 25241 with respect to wine that bears petitioners' federally approved labels is denied and the alternative writ is discharged. All parties shall bear their own costs in this proceeding. (Cal. Rules of Court, rule 56(l)(2).)

Raye, J., and Morrison, J., concurred.

A petition for a rehearing was denied June 20, 2005, and the opinion was modified to read as printed above. Petitioners' petition for review by the Supreme Court was denied August 24, 2005. Werdegar, J., did not participate therein.